The TIMKEN COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant,

NTN Toyo Bearing Co., Ltd., NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp., Koyo Seiko Company, Ltd. and Koyo Corp. of U.S.A., Defendants-Intervenors.

Court No. 87–03–00534.

United States Court of International Trade.

April 6, 1987.

Stewart and Stewart (Terence P. Stewart at oral argument; Eugene L. Stewart, Washington, D.C., and Michael J. Englert, New York City, with him on the brief), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., (Velta A. Melnbrencis, New York City, on the brief), Civil Div., United States Dept. of Justice, Lisa B. Koteen (at oral argument), Office of the Deputy Chief Counsel, Washington, D.C., for Import Admin., U.S. Dept. of Commerce, for defendant.

Barnes, Richardson & Colburn (Donald J. Unger), Chicago, Ill., for defendants-intervenors NTN Toyo Bearing Co., Ltd., NTN Bearing Corp. of America, and American NTN Bearing Mfg. Corp.

Tanaka, Ritger & Middleton (Patrick F. O'Leary at oral argument; H. William Tanaka and Alice L. Mattice, Washington, D.C., with him on the brief), for defend-

ants-intervenors Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

## OPINION

RESTANI, Judge.

This action was brought to challenge the decision of the Department of Commerce, International Trade Administration (Commerce), to deny plaintiff access to computer tapes submitted by defendant-intervenors in the investigation of *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from Japan*, ITA No. A–588–604, 51 Fed.Reg. 33286 (Sept. 19, 1986) (Notice of Investigation).[1] The tapes contain sales and cost information that previously was provided to plaintiff in roughly 15,000 pages of computer printout. Plaintiff contends that "[t]he sheer volume of data submitted in the questionnaire responses precludes Timken from realistic participation in the investigation unless Timken is provided with access to the computer tapes containing the data." Plaintiff's Complaint at para. 13. The parties have agreed to resolve this issue on an expedited schedule.[2]

■ The parties are in general agreement about the scope of review that is applicable to this case. The relevant statutory language provides that the court may

1. Jurisdiction in this case is based on 28 U.S.C. § 1581(f) (1982), which provides:
   (f) The Court of International Trade shall have exclusive jurisdiction of any civil action involving an application for an order directing the administering authority or the International Trade Commission to make confidential information available under section 777(c)(2) of the Tariff Act of 1930 [19 U.S.C. § 1677f(c)(2) (1982)].

2. Commerce's preliminary determination was published on March 27, 1987, at 52 Fed.Reg. 9905. The public hearing in the final investigation should take place within 30 to 50 days thereafter.

3. The government's position with respect to scope of review is somewhat unclear. In its brief, Commerce states, "[i]n this case, the balancing test is irrelevant as far as [Commerce] is concerned. The question is whether plaintiff has any right to information in computerized form after receiving it on paper." Defendant's Memorandum In Opposition to Plaintiff's Motion at 11. Later, however, defendant argues that the only directly applicable judicial prece-

direct Commerce to disclose confidential information if such an order is warranted "under the standards applicable in proceedings of the court." 19 U.S.C. § 1677f(c)(2) (1982). The phrase "under the standards applicable in proceedings of the court" is defined in the legislative history as follows:

The quoted phrase is intended to refer to the court's practice of determining *de novo*, after, if necessary, an *in camera* examination of the documents, whether the need of the party requesting the information outweighs the need of the party submitting the information for continued confidential treatment.

S.Rep. No. 249, 96th Cong., 1st Sess. 100 (1979) (emphasis in original), *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 486. This language clearly requires the court to resolve claims brought under section 777(c)(2) by balancing the respective interests of the parties. *See also Monsanto Indus. Chem. Co. v. United States*, 6 CIT 241, 243 (1983) (applying the balancing test in case brought under 28 U.S.C. § 1581(f)). *Cf.* 19 C.F.R. §§ 353.30(a)(3) and 355.20(a)(3) (1986) (providing that the Secretary of Commerce must initially perform a similar balancing test in deciding whether to release confidential information).[3]

dent is *Monsanto*, in which the court applied the balancing test in ruling for the government. *Id.* at 242.

The court is not persuaded that the balancing test is irrelevant simply because the instant case concerns the *form* of data released. Data released in an unusable form are, after all, the equivalent of no data at all. Nor is the balancing test irrelevant merely because Commerce has its own institutional interests. In *Monsanto*, the court explicitly considered the government's interests in the context of the balancing test. Cases in which the court has applied standards of review more deferential to the agency fall under different jurisdictional provisions of the court, and therefore, are not applicable here. *See, e.g., Arbed, S.A. v. United States*, 4 CIT 132 (1982) [Available on WESTLAW, DCT database] (stating, in a case to *prevent* disclosure under § 1581(i), that an agency's decision not to disclose confidential information information should not be disturbed unless it "effectively disables" the party seeking disclosure).

### The Parties' Interests

Plaintiff has attempted to demonstrate need with evidence regarding the time and expense necessary to duplicate the computer tapes. According to affidavits filed by plaintiff and the testimony of an expert witness, a keypuncher would require roughly 7,500 hours to create a computer tape containing the 15,000 pages of printout currently in plaintiff's possession. The work would cost about $200,000, and could be completed before the final hearing date only if a legion of keypunchers were employed. These facts are not disputed by defendants.

An equally important aspect of need is the purpose for which plaintiff requires access to the computer tapes. Plaintiff's brief was quite nebulous on this point, stating only that the tapes were needed to calculate the "significance of certain errors" and to analyze data more cost-effectively. Plaintiff's Complaint, Exhibit 6 at para. 6; Memorandum in Support of Plaintiff's Motion at 3. At oral argument, plaintiff outlined its need for the tapes in greater specificity. In order to compare foreign producers' home and foreign market sales, Commerce must match roughly equivalent domestic and foreign bearing types. To select an appropriate "model match" Commerce classifies bearings on the basis of 3 factors: inside diameter, outside diameter, and dynamic load rating. Where, as in this case, a substantial number of bearing types are involved, myriads of "model matches" are possible. Plaintiff argues that without the computer tapes, it will be unable to assess which match variations are most beneficial to its interests. Plaintiff also indicated that without the tapes it would be unable to assist Commerce in identifying factual errors in the data inputted and other mathematical and methodological errors that might occur in the calculation of margins.

The government contends that disclosure of the tapes would seriously disrupt operations at Commerce. If Commerce were required to supply plaintiff with the tapes, it would have to copy the tapes, insure that proper deletions (*e.g.*, customer names) had been made, and assist plaintiff with any mechanical problems it might have in extracting information from the tapes. Plaintiff's expert witness estimated that 13 tapes would take roughly 12 hours to copy with redactions.[4] Defendant stated that 18 hours per tape would be required to insure that all redactions had been made properly.

At oral argument plaintiff agreed to pay for these services if they were performed by an outside company. If disclosure were granted on this basis, the government's chief expenses would be investigating the outside data services companies for proper compliance with confidentiality regulations, and inspecting the tapes to make sure that redactions were properly made. Counsel for Commerce indicated that these tasks could be accomplished in half a working day.[5]

Commerce also expressed concern that the release of computer tapes in this case would create a spate of similar litigation and impair the agency's ability to receive computer tapes in future proceedings. Commerce may not require an exporter to submit information on computer tapes unless the exporter normally maintains records in computerized form. H.R.Rep. 317, 96th Cong., 1st Sess. 69 (1979). Commerce acknowledges that this policy prevents it from using the "best information otherwise available" when parties who do not normally computerize sales and cost information refuse to submit such data in computerized form. *See* 19 U.S.C. § 1677e(b) (1982) (requiring Commerce to use the "best information otherwise available" when a party fails to produce information "in a timely manner and *in the form required*" (emphasis added)). Thus,

**4.** According to Commerce, the total number of tapes involved in the case would probably be more than 13, but less than 30.

**5.** Commerce indicated that it had made some corrections to the data on the tapes and that it

would have to produce new tapes with the corrections. Plaintiff indicated this was not necessary. If Commerce for its own reasons wishes to produce such tapes, rather than turning over intervenors' amended tapes, it may do so.

exporters who do not computerize sales and cost data might have an incentive not to submit computer tapes in the future.

■ Intervenors have lodged two additional objections to the release of the tapes. First, as the number of people handling the data increases, the possibility of unlawful disclosure must also increase. Tapes can be copied easily and may be difficult to locate after a protective order has been breached. Second, intervenors contend that plaintiff should not be allowed to "feast on the fruit of their labors." Drawing an analogy from the work-product doctrine, intervenors argue that their tapes were prepared in anticipation of litigation and, therefore, should not be released.[6]

### Balancing the Interests

■ After carefully weighing the considerations raised by the parties, the court concludes that the plaintiff should be granted access to the computer tapes subject to conditions set forth in the court's opinion. Plaintiff has presented compelling evidence that the time and expense required to keypunch intervenors' cost and sales data is prohibitive. Plaintiff's need for the data is, however, less clear. Defendants have argued that plaintiff's role in the administrative proceeding is properly limited to providing comments on the methodology used by Commerce. They further contend that plaintiff can adequately fulfill this responsibility with the information it now has. Plaintiff had already submitted written comments totaling 2,975 pages as

of March 13, 1987. Defendants allege that plaintiff seeks the computer tapes only for the purpose of calculating its own margins. This, defendants argue, duplicates the function of Commerce, and is not a proper justification for the release of data. *See Monsanto*, 6 CIT at 243 ("Plaintiff is not empowered to act as an independent investigator to the proceeding."); *Sacilor, Acieries et Laminoirs de Lorraine v. United States*, 3 CIT 191, 195, 542 F.Supp. 1020, 1025 (1982) (decision to release confidential information "should not confuse the role and need of a party to an administrative investigation with that of a litigant in a court of law and it should not reflect an abdication of the investigative duties of the agency").

This objection ignores the realities of effective advocacy in complex trade cases. Counsel for domestic and foreign producers routinely perform their own margin calculations in antidumping cases. Without calculating the relative margins produced by different methodologies, parties have no idea whether they are advocating those lawful alternatives that promote their interests.[7] In cases involving fewer data or simpler methodologies, these strategic decisions may be made instinctively or with the aid of small data samples. In cases such as this, however, where complex match models are involved, computer tapes may be essential for effective advocacy.[8] The *Arbed* court seemed to recognize that its prohibition on the "duplication of administrative functions" would not apply in cases

---

**6.** The work-product doctrine is not directly applicable here. The paper computer printout in plaintiff's possession has already revealed any mental impressions, legal theories or strategy that might be in the tapes. *See National Union Electric Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1257, 1260–61 (E.D.Pa.1980) (holding work product doctrine inapplicable to computer tapes containing data previously submitted to defendants in printed form).

**7.** Given the narrow scope of review at the judicial level, it is imperative that parties be able to draw distinctions between a number of potentially reasonable approaches at the administrative level.

**8.** Commerce has determined that this case is "extraordinarily complicated" within the mean-

ing of 19 U.S.C. § 1671b(c)(1)(B). Commerce stated:

> We determine that this case is extraordinarily complicated because it involves an unusually large number of sales transactions to be investigated, there are an extraordinarily large number of different products involved, the transactions to be investigated are considered complex due to the number of adjustments to be made, and because all home market transactions must be compared to the cost of production.

*Tapered Roller Bearings, and Parts Thereof, Finished or Unfinished From Japan*, 52 Fed.Reg. 2125 (Jan. 20, 1987) (Postponement of Preliminary Antidumping Determination).

where salient issues required a general need for data. The court concluded:

> As it turns out, now that the Court is faced with a concrete dispute involving a rather general need, the reasoning based on distinctions between investigation and litigation begins to break down, and the decision of the agency accepting the general need to make informed comment cannot quite be called an abdication of investigative duty. The Court cannot reach a standard in which general informed comment is never a justifiable contribution to the investigation.

*Arbed,* 4 CIT at 135.

Intervenors' concerns about confidentiality are not compelling. The data contained in the tapes has already been released to plaintiff; thus, the risk of unlawful disclosure will be increased only marginally. The court will further minimize this risk by allowing intervenors to select the data service companies that will copy the tapes and perform necessary redactions. Plaintiff will be required to pay copying and redaction costs to the companies performing these services.

Such an arrangement should also minimize the involvement of Commerce. Although Commerce may wish to inspect the copied tapes and the facilities where copies are made, Commerce itself has represented that this would not pose a significant burden. Furthermore, intervenors' involvement in the copying and redaction process should guarantee that only a cursory inspection by Commerce is necessary.

The government's second concern, that exporters may refuse to submit computer tapes in future investigations, is more troubling. Nevertheless, the premises of Commerce's argument are somewhat flawed. Commerce has not demonstrated that a substantial number of foreign exporters rely on non-computerized cost and sales records. Moreover, it is unlikely that the mere possibility of trade litigation in the United States would prompt foreign exporters to return to archaic business procedures. Thus, Commerce would appear to be in little danger of losing access in the future to tapes prepared for business purposes. It does appear that some of the tapes at issue were prepared particularly for the administrative proceeding. Commerce provided no information as to how often this occurs and whether it is in the interest of the parties to submit regular business tapes, rather than specially prepared tapes.

The instant case should not be understood as authority for compelling the distribution of computer tapes in all administrative proceedings. The court's decision turned on a wide range of factors, including the need of the party requesting the information and the need of the party submitting it for continued confidential treatment. In subsequent cases these factors and other relevant concerns will no doubt present themselves in a much different balance.

In accordance with the above reasoning, Commerce's decision to deny plaintiff access to the computer tapes is hereby reversed. Within five business days of the date of this opinion, the parties shall complete the terms under which the tapes will be duplicated, handled, and ultimately returned. Within the same time period, intervenors will select data service companies to copy and redact the tapes, and will arrange with Commerce a schedule for inspecting the copied tapes and the facilities where the tapes will be copied and redacted. If the parties fail to agree on these matters within the prescribed time, the court will execute appropriate orders, provided such orders are proposed in a timely manner by the parties.