**SNR ROULEMENTS, SNR Bearings USA, Inc., and Icsa Industria Cuscinatti S.p.A., Plaintiffs,**

v.

**UNITED STATES of America, United States Department of Commerce, C. William Verity, Jr., Secretary of Commerce, and Jan W. Mares, Assistant Secretary For Import Administration, Defendants,**

**and**

**The Torrington Company, Defendant–Intervenor.**

**Court No. 88–12–00893.**

United States Court of International Trade.

Jan. 5, 1989.

Donovan Leisure Newton & Irvine,
Pierre F. de Ravel d'Esclapon and Thomas

R. Trowbridge, III, New York City, for plaintiffs.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., Jane E. Meehan, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Douglas S. Cohen, for defendants.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Charles A. St. Charles, Washington, D.C., for defendant-intervenor.

DiCARLO, Judge:

Foreign producers of anti-friction bearings and parts (the "foreign producers") challenge an order of the International Trade Administration of the United States Department of Commerce (Commerce) that unless they consented within 24 hours to the release, under administrative protective order (APO), of computer tapes containing confidential business proprietary information to attorneys representing the United States industry and independent computer consultants hired by the attorneys, Commerce would reject the foreign producers' questionnaire responses in favor of the "best information available."

The Court finds that Commerce may determine that the attorneys' assumption of responsibility for the actions of their computer consultants can serve as part of an adequate deterrent to the disclosure of confidential information, that the attorneys in this action demonstrated a need for the information sought and that Commerce properly balanced that need, and that Commerce's determination to release business proprietary data under the terms of the APO is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### BACKGROUND

On March 31, 1988, the Torrington Company filed antidumping petitions to investigate anti-friction bearings imported into the United States from 23 companies located in France, Italy, Japan, Romania, Singapore, Sweden, Thailand, the United Kingdom, and the Federal Republic of Germany. Commerce asked the foreign producers in each of the nine countries to answer questionnaires and submit certain information on computer tapes and in printout form. The foreign producers complied and supplied both computer tapes and printouts. Commerce later determined that the product under investigation should be broken down into five classes or kinds of merchandise: ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings, and plain bearings.

### A. Application for Release of Computer Tapes

In May and June of 1988, attorneys representing the domestic industry and four non-attorneys employed by a computer consultant firm retained by the attorneys (the "computer consultants") applied for release under an APO of the foreign producers' business proprietary information in its various forms. See 19 C.F.R. § 353.30(a) (1988). The computer consultants are located in a data processing center in the same building and on the same floor as the law offices of the attorneys for the domestic industry. R. 1, at 1. Requests were made for each of the countries under investigation. The requests included (1) verification reports and exhibits, (2) computer tapes, and (3) floppy disks or diskette data submitted by the foreign producers or created by Commerce. The attorneys asked that four non-attorney computer consultants be allowed to process the electronic data and work with the hard copy at the business premises of the computer consultants. Under the proposed APO, the attorneys agreed to be held responsible for the actions of its computer consultants and their personnel. The attorneys' assumption of accountability subjects them to disciplinary sanctions, including disbarment, should their computer consultants violate the protective terms of the APO.

### B. Partial Consent to Release of Confidential Information

The foreign producers consented to the release of their business proprietary data

submitted in hard copy form to the attorneys for the domestic industry, and Commerce issued an APO granting access to the business proprietary data in hard copy form. The foreign producers objected, however, to any release of (1) verification exhibits, (2) customer names, (3) computer tapes, and (4) any information to the computer consultants.

### C. Commerce's Determination to Allow Release of Tapes

In ruling on the motion to release computer tapes and confidential information to outside computer consultants, Commerce (1) denied access to confidential verification exhibits but granted access to the confidential verification report, (2) denied the request for confidential floppy disks or diskettes, (3) granted (to both the attorneys and their computer consultants) access to expurgated versions of computer tapes already submitted and tapes that would be submitted later in the investigation, (4) granted further release to the computer consultants that information in hard copy form already released to the attorneys, and (5) permitted the computer consultants to analyze the hard copy data and computer tapes at the business premises of the computer consultants. R. 40.

Commerce telephoned the foreign producers on Friday, December 2, 1988, to notify the foreign producers that it was transmitting a letter by telecopy regarding its decision to release under APO copies of the computer tapes. Commerce gave the foreign producers a "twenty-four hour" deadline, in this action only until noon on Monday, to advise Commerce in writing of their intention to comply with Commerce's decision, to be followed by a period of ten business days in which to redact customer or supplier names or identifiers from the computer tapes and serve the attorneys for the domestic industry with one copy of each of the redacted tapes. R. 56. Commerce warned that the failure to comply would result in rejection of relevant portions of questionnaire responses and use of the "best information available" rule in Commerce's final determinations of wheth-

er producers in each country were selling in the United States at less than fair value.

### D. Action in the Court of International Trade

The foreign producers filed an action in this Court on December 5, 1988 for a temporary restraining order preventing Commerce from releasing computer tapes to the attorneys for the domestic industry or any confidential information to their computer consultants. The Court granted the restraining order and further restrained Commerce from rejecting any portion of the questionnaire responses or otherwise penalizing the foreign producers for refusing to release their business proprietary information. The foreign producers also moved for injunctive relief under Rule 65 of the Rules of this Court, contending that Commerce's order is arbitrary and capricious. The producers contend that they were presented with the Hobson's choice of either consenting to the release of their most sensitive confidential data to non-lawyer computer consultants in a form readily conducive to untraceable, instantaneous transfer and copying, or having their questionnaire responses, prepared at substantial cost, ignored in Commerce's determination and thus be prevented from submitting any meaningful evidence. *Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunctive Relief*, at 2–3.

### JURISDICTION AND STANDARD OF REVIEW

■ In cases where Commerce *denies* access to confidential business proprietary information, jurisdiction in this Court is based on 28 U.S.C. § 1581(f) (1982), and actions to compel disclosure of that confidential information under protective order are evaluated in this Court *de novo* on the administrative record to determine whether the need of the party requesting the information outweighs the need of the party submitting the information for continued confidential treatment. 19 U.S.C. § 1677f(c)(2) and 28 U.S.C. § 2640(a)(4) (1982); S.Rep. No. 249, 96th Cong., 1st Sess. 100, *reprinted in* 1979 U.S.Code

Cong. & Admin.News 381, 486; *D & L Supply Co. v. United States*, 12 CIT ——, 693 F.Supp. 1179, 1181 (1988); *Timken Co. v. United States*, 11 CIT ——, 659 F.Supp. 239, 240 (1987).

In cases where Commerce *allows* the release of confidential information under a protective order, as it did in this case, this Court's jurisdiction to review that action is based on 28 U.S.C. § 1581(i) (1982), and the standard of review is whether Commerce's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1982); 28 U.S.C. § 2640(d) (1982); *Arbed, S.A. v. United States*, 4 CIT 132, 133 (1982); *Sacilor, Acieries et Laminoirs de Lorraine v. United States*, 3 CIT 191, 542 F.Supp. 1020 (1982).

## DISCUSSION

■ Antidumping and countervailing duty actions require that certain documents, comments, and information be accorded confidential status because even inadvertent disclosure of business proprietary information can be highly damaging and irreparable by conventional legal remedies. *Chevron U.S.A., Inc. v. United States*, 11 CIT ——, Slip Op. 87–13 at 6 (Feb. 6, 1987) [1987 WL 6318]; *Sacilor, Acieries et Laminoirs de Lorraine v. United States*, 3 CIT 191, 195, 542 F.Supp. 1020, 1025 (1982). The parties concede that a higher risk of unauthorized disclosure of business proprietary information on computer tape as opposed to printouts warrants a heightened level of protection for computer tapes. *See Yale Materials Handling Corp. v. United States*, 11 CIT ——, 674 F.Supp. 865, 867 (1987).

### 1. *Assumption of Liability for Computer Consultants*

■ Business proprietary information has been released under APO to attorneys because the sanctions for violation of the APO, including disbarment from practice before Commerce under 19 C.F.R. § 355.20(e) (1988) and the further prospect of professional disbarment, have been found sufficient to address the valid concerns of foreign producers and foreign governments that information submitted in confidence might be disclosed. *D & L Supply Co. v. United States*, 12 CIT ——, 693 F.Supp. 1179, 1182 (1988); *Chevron U.S.A., Inc. v. United States*, 11 CIT ——, Slip Op. 87–13 at 7–8 (Feb. 6, 1987). Commerce's decision to release confidential information on computer tapes to attorneys and their non-attorney computer consultants turns not on the adequacy of sanctions available against the attorneys, but rather their non-attorney computer consultants.

Counsel for SNR argues that the attorneys' willingness to assume liability for the actions of the computer consultants is "illusory," because the consultants are not themselves subject to disbarment. *Supplemental Memorandum in Support of Plaintiffs' Motion for Preliminary Injunctive Relief*, at 3.

Depending on the sanctions available to deter disclosure of confidential information, the court has both denied and permitted the release of confidential computer tapes to computer consultants. In *Yale Materials Handling Corp. v. United States*, 11 CIT ——, 674 F.Supp. 865, 867 (1987), the court denied access to computer tapes to outside computer consultants because there were no catastrophic and unavoidable sanctions available to deter the release of confidential information. Commerce had intended to release the tapes to an outside computer firm to copy the tapes and delete customer names prior to protective order release to counsel for petitioner, but neither the petitioner's counsel nor the respondent's counsel agreed to accept responsibility for the protective order data in the hands of an independent computer firm selected by Commerce. The sanctions were accordingly found to be "pale and ineffective." *Id.* Conversely, in *American Brass v. United States*, 12 CIT ——, ————, 699 F.Supp. 934, 937–938 (1988), the Court granted access to computer tapes to "in-house" computer consultants because the court found that

third parties such as computer programmers are not *per se* excluded from access to confidential information on computer

tape. While it may be unusual to allow access to confidential information to persons other than counsel, as long as a protective order can fashion adequate sanctions to deter disclosure by any third parties who may come into contact with the tapes it is sufficient protection. *Cf. Yale Materials Handling Corp.*, 11 CIT at [——], 674 F.Supp. at 867 (sanctions in a protective order as to outside computer companies did not contain the required degree of deterrence). While the fact that third parties may be required to assist processing of the tapes may be a factor in the decision whether to release confidential information, it will not, in and of itself, preclude access. To conclude otherwise would effectively make computer tapes unavailable in any case where counsel find it necessary to seek the assistance of computer programmers. The protective order subsequently fashioned in *American Brass* and approved by the Court on December 14, 1988 provides that a breach by a computer systems manager or an economist employed by the attorneys would "be deemed a breach by counsel for American Brass." *Consent Motion for Amendment of Stipulations and Protective Orders*, at 3, Court Nos. 87–04–00589 and 87–04–00575. Together with the other sanctions in the APO, the attorneys' assumption of liability was found to provide an adequate deterrent to the disclosure of confidential information.

In this investigation Commerce found that the attorneys' assumption of liability provided a sufficient degree of protection to the confidential information:

We believe that the attorneys' assumption of responsibility for the computer specialists' compliance with the terms of the requested protective orders, the threat of sanctions for violation of the terms of the requested protective orders, the terms and conditions of the requestors' applications for protective orders, and the protective orders themselves provide a sufficient degree of protection for the proprietary data.

R. 40, at 6–7.

The Court finds that the attorneys' willingness to assume liability for the actions of their computer consultants is neither hollow nor illusory as counsel for SNR has claimed. The Court finds an analogous situation involving the secretaries of attorneys, who may learn confidential information in the course of typing a confidential brief. Counsel for SNR conceded that secretaries would not be subject to disbarment just as computer consultants would not be subject to disbarment. Although the attorney would likewise bear responsibility if a secretary disclosed confidential information, counsel for SNR argues that "we have to have an element of reason," and that the in-house computer programmer employed in *American Brass* is different from a computer consultant who is removed from the attorney's direct supervision. The Court agrees that when sanctions and direct supervision are distant, there is a greater risk of disclosure. This increased risk is, however, a factor for the agency to consider in determining whether to grant applications for access to confidential information. Commerce did consider this risk in this investigation and fashioned an APO that it found sufficient to protect the confidentiality of the business proprietary information.

### 2. *Assumption of Liability for Foreign Attorneys*

A Belgian attorney was also included in the application for access to confidential information. The foreign producers contested his right of access because he could not be disbarred by an American court. Under the same principles of a principal's responsibility for the actions of its agent that the Court approved for computer consultants, the Court finds that the American attorneys' assumption of liability for the actions of their Belgian colleague provides an adequate sanction.

### 3. *Balancing Test*

SNR contends that there is no need for the information sought in this investigation, only a desire to have access to the computer tapes. For example, there is no complex model matching as was involved in

*Timken Co. v. United States,* 11 CIT ——, 659 F.Supp. 239, 240 (1987), because identical products are involved in this investigation. Consequently, SNR argues that the attorneys for the domestic industry could have easily checked the hard copy against Commerce's program. SNR asserts that the attorneys for the domestic industry have asserted nothing more than a "nebulous need" and have not described with sufficient particularity their need for the information sought.

Although disclosure of confidential information is meant to aid in effective advocacy, petitioners' counsel are not empowered to act as an independent investigator to the proceeding. *Monsanto Indus. Chem. Co. v. United States,* 6 CIT 241, 243 (1983). Petitioners should not attempt pure duplication of Commerce's function, but rather provide the comment and analysis which will contribute the objectives of the investigation more than it will detract from the confidentiality of the information. *Arbed, S.A. v. United States,* 4 CIT 132, 136 (1982).

The law governing the release of confidential information has undergone a steady evolution since the Trade Agreements Act of 1979 first authorized release under APO of confidential information submitted by petitioners and respondents in antidumping and countervailing duty investigations. *See generally* Garfinkel, *Disclosure of Confidential Documents Under the Trade Agreements Act of 1979: A Corporate Nightmare?,* 13 Law & Pol'y Int'l Bus. 465 (1981). The United States is one of the few nations in the world to even allow release of confidential information in these international trade cases. Taylor & Vermlust, *Disclosure of Confidential Information in Antidumping and Countervailing Duty Proceedings Under United States Law: A Framework for the European Communities,* 21 Int'l L. 43, 43–44 (1987). Until 1984, Commerce was required to await submission of each party's confidential information before entertaining applications for release describing particularly the information sought, and to make a decision based on the balance of need for the information and the risk of potential disclosure.

*See Sacilor, Acieries et Laminoirs de Lorraine v. United States,* 3 CIT 191, 542 F.Supp. 1020 (1982).

Under section 619 of the Trade and Tariff Act of 1984, Commerce was given discretion to entertain applications and release data under APO even before the data is filed with the agency:

> Upon receipt of an application, (before or after receipt of the information requested) which describes with particularity the information requested and sets forth the reasons for the request, the administering authority and the Commission may make confidential information submitted by any other party to the investigation available under a protective order....

19 U.S.C. § 1677f(c)(1)(A) (Supp. IV 1986). *See* H.R.Rep. No. 725, 98th Cong., 2d Sess. 44–45 (1984). The attorneys for the domestic industry applied for the computer tapes before they were submitted. R. 1–18.

Under section 1332 of the Omnibus Trade and Competitiveness Act of 1988, P.L. 100–418, 102 Stat. 1107, 1207–08, the standards for granting access to confidential information will further ease in future investigations because applicants must make their requests only in general terms rather than with particularity. This provision of the new trade law applies, however, only to those investigations initiated after August 23, 1988. *Id.* § 1337, 102 Stat. at 1211.

▆ Under the law in effect in this determination, Commerce was charged with weighing "whether the need of the person requesting the information outweighs the need of the person submitting it for continued confidential treatment." 19 C.F.R. § 353.30(a)(3) (1988). Although Commerce had released the hard copy to the attorneys for the domestic industry, Commerce correctly recognized that "release of the hard copy data did not dictate the future release of the computer tapes." R. 40, at 6. Rather, Commerce applied the balancing test to the computer tapes:

> In complex trade cases, such as the present antidumping investigations, we believe that reasonable measures which

ensure the effective advocacy by the relevant domestic industry are consistent with the overall purpose of the trade law and their provisions for participation by interested parties.

R. 40, at 6. Counsel for the domestic industry emphasizes the importance that computer tapes have recently achieved in ensuring effective advocacy in import relief cases:

> with wider use of computers, the data on the computer tapes are perhaps the most important record evidence in an antidumping proceeding. The narrative questionnaire responses serve to explain the computer tape; verification is increasingly an exercise in establishing that the contents of the computer tape are accurate; revisions and corrections that result after verification typically require the submission of new computer tapes. Thus, it is unfair for the respondents but not the petitioner to have access to the most important evidence relied upon to render the final determination.

*Supplemental Memorandum of the Torrington Company re Access to Computer Tapes,* at 2.

Recognizing the domestic industry's need for effective advocacy, Commerce found that

> release of the computer tapes under the terms of an APO specifically written to provide a heightened degree of protection, is reasonable, and will significantly assist petitioner's meaningful participation in these investigations. In light of *Timken* and *Yale Materials,* the need of petitioner's counsel for respondents computer tape data in these investigations outweighs the interest of the respondents for continued proprietary treatment.

R. 40, at 6.

SNR and the plaintiffs in related cases decided today complain that the fact that Commerce issued only one determination to cover all of them demonstrates that Commerce abdicated its responsibility to apply the balancing test on a company-by-company basis.

Commerce was faced with a single applicant for each of the APOs sought, rather than several law firms with different computer consultants. The applicant sought the tapes of all respondents, not just of one company in each country. Although Commerce stated that all antidumping investigations are complex, R. 40, at 6, Commerce had found that the nine investigations involving 23 companies were extraordinarily complicated within the meaning of 19 C.F.R. § 1671(c)(1)(B):

> [T]hese cases are extraordinarily complicated because they involve unusually large numbers of sales transactions, there are an extraordinarily large number of different products involved, there is further processing by the respondents U.S. subsidiaries before sale to an unrelated party, and because we are investigating allegations that home market sales are being made below the cost of production.

*Postponement of Preliminary Antidumping Duty Determination; Antifriction Bearings and Parts Thereof from the Federal Republic of Germany, France, Italy, Romania, Singapore, Sweden, Thailand, and the United Kingdom,* 53 Fed.Reg. 27,-738 (July 22, 1988). The petitioner thus presented a general need as in *Arbed, S.A. v. United States,* 4 CIT 132, 136 (1982).

All of the foreign producers share the valid and important concern for inadvertent disclosure of confidential business proprietary data submitted on computer tape. The nature of the data, including home market prices, United States prices, third country prices, sales data, quantities, and adjustments for transportation costs and circumstances of sale, were again identical.

Commerce's single memorandum in response to a single application did consider the arguments against disclosure raised by each of the companies. Commerce summarized each of the arguments submitted to it and addressed the concerns raised by each of the companies. R. 40, at 2–4. Commerce did not abdicate its duty to balance the needs of each of the parties in this investigation. Under the circumstances of this investigation, the Court finds that Commerce was not required to issue separate memoranda for each of the respon-

dents because the single memorandum addressed the individual concerns raised by each company.

### 4. *Twenty-four Hour Notice*

 Counsel for SNR also contended that it was arbitrary and capricious for Commerce to demand that the foreign producers give their consent within twenty-four hours or else be subjected to the best evidence rule. At oral argument counsel for SNR acknowledged the existence of Commerce's twenty-four hour practice but stated that he "had been fighting Commerce on this for years." Under these circumstances, counsel knew of Commerce's practice, knew that applications for release of confidential information were pending, and could have communicated with the foreign producers or asked for an extension of the deadline. SNR has not been prejudiced in this case because the temporary restraining order from this Court has extended their decision-making time by several weeks.

### CONCLUSION

The Court finds that Commerce may determine that the attorneys' assumption of responsibility for the actions of their computer consultants can serve as part of an adequate deterrent, together with other available sanctions, against disclosure of confidential information, that the attorneys in this action demonstrated a need for the information sought and that Commerce properly balanced that need, and that Commerce's determination to release business proprietary data under the terms of the APO is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.